J-A21022-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1120 EDA 2021 |

Appeal from the Order Entered May 10, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001065-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1121 EDA 2021 |

Appeal from the Decree Entered May 10, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000223-2021

BEFORE:   KUNSELMAN, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED FEBRUARY 1, 2022**

C.C. (Mother) appeals[1] from the order granting the petition filed by the

Philadelphia Department of Human Services (DHS) to involuntarily terminate

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Father filed a separate appeal from the order, which is docketed at 933 EDA 2021 and addressed in a separate memorandum.

her rights to her minor child, A.M.M. (Child), born in May of 2019, and the decree changing Child's permanency goal to adoption.[2]  After careful review, we affirm.

The trial court accurately summarized the facts of this matter as follows:

[DHS] first became aware of this family on May 19, 2019, when it received a General Protective Services (GPS) report concerning allegations that Mother tested positive for Percocet at Child's birth, for which she did not have a prescription.  The GPS report stated that although [Child] did not test positive for any substances at her birth, she would be assessed for withdrawal and possibly started on a morphine treatment because [Child's] Neonatal Abstinence Syndrome (NAS) score was 10, which was high.  The GPS report alleged that Mother also had two male children that were residing with relatives in Bucks County, Pennsylvania.[3]  The GPS report also alleged [that] Mother was diagnosed with anxiety and depression, but was not receiving treatment or prescribed medication.

On May 20, 2019, DHS visited [Child] at Einstein Medical Center (EMC), and hospital staff confirmed that [Child] was suffering from severe withdrawal.  Hospital staff stated that [Child] was receiving morphine maintenance and would need to remain hospitalized for further treatment. . . .

DHS visited Mother and Father at [Child's] paternal grandmother's home on May 20, 2019.  Mother denied having a history of substance abuse issues.  Mother stated that she used one 15 milligram Percocet pill, which she purchased illegally, to treat back pain.  Father denied awareness of Mother's drug use.  Father also stated that he used drugs for 12 years until 2018, when he became sober.

---

[2] Mother's appeals were consolidated by this Court *sua sponte*.  **See** Order, 6/24/21.

[3] Mother's two older children are Child's half-brothers.  Both siblings reside with their adoptive parent and that family's biological children.

On June 5, 2019, DHS received a supplement to the GPS report alleging that Mother's drug of choice was heroin or Phencyclidine (PCP). The GPS report alleged that Mother had not been able to maintain sobriety. The report also stated that the adoptive parent of [Child's] siblings was willing to be a placement resource for [Child].

[After spending several weeks in the NICU, Child was discharged from EMC on June 24, 2019. That same day, the trial court held a shelter care hearing, at which] the temporary commitment to DHS was ordered to stand. On that date, [Child] was placed in the care of her siblings' adoptive parent, where she remains. On July 1, 2019, [Child] was adjudicated dependent and committed to DHS.

A Single Case Plan (SCP) meeting was held on July 10, 2019, at which time the permanency goal was reunification. The parental objectives for Mother were to maintain appropriate housing and employment; to comply with dual diagnosis treatment; to attend NET three times per week; to complete three random drug screens; to participate in visits; and to attend parenting classes. *Id.* Mother's single case plan objectives remained consistent throughout the life of the case. *Id.* at 14. On July 29, 2020, Community Umbrella Agency (CUA) changed the permanency goal for [Child] to adoption.

On April 26, 2021, DHS filed petitions to change the goal from reunification to adoption and to involuntarily terminate Mother's parental rights. [On May 10, 2021, the trial court held a hearing on DHS's petitions.] At the hearing, the court heard testimony from [Nathan Kipp, a case manager from] Community Umbrella Agency (CUA), [Robert Buchofer from] Community Behavioral Health (CBH), [and Mother and Father, who testified on their own behalf.]

[Mr. Kipp] testified that he has been the assigned worker this case since its inception at [Child's] birth on May 17, 2019. N.T. Termination Hr'g, 5/10/2021, at 13. Mr. Kipp testified that [Child] came into care because Mother tested positive for Percocet at her birth. *Id.* at 13. Mr. Kipp testified that although [Child] did not test positive for any substances at birth, she was placed on morphine maintenance to help with withdrawal symptoms. *Id.*

Mr. Kipp further testified that Mother's single case plan objectives were as follows: (1) maintain appropriate housing and employment, (2) submit random drug screens, (3) attend

parenting, housing, and financial education classes through ARC, (4) participate in a dual diagnosis program to address her mental health and drug and alcohol history; and (5) participate in visitation. *Id.* at 14. Mr. Kipp rated Mother's compliance with her single case plan objectives as "minimal" and Mother's progress towards alleviating the reasons that brought [Child] into care as "none." *Id.* at 23.

Mr. Kipp testified that Mother was referred to the Clinical Evaluation Unit (CEU) for a forthwith drug screen and nine random drug screens. *Id.* at 14. Mother submitted a forthwith random drug screen on October 9, 2019 and one random drug screen on February 25, 2021; she did not submit additional random drug screens. *Id.* Mother tested positive for PCP in June 2019, and tested positive for PCP, benzodiazepine, and cocaine in February 2021. Mr. Kipp testified that Mother enrolled in a drug and alcohol treatment program through Wedge Recovery Centers (The Wedge), which she was attending at the time of the TPR hearing. *Id.* at 15. Mr. Kipp testified that Mother also enrolled in an inpatient drug and alcohol treatment program through Ambrosia but left against medical advice after completing half of the program. *Id.* at 16. Mr. Kipp testified that Mother did not engage in a mental health program, although The Wedge offered a mental health program. *Id.* at 16. CUA also referred Mother to BHS for an evaluation, but Mr. Kipp did not receive any documentation that Mother attended the evaluation. *Id.* at 17

Mr. Kipp testified that, Mother has engaged in ARC, but has never completed any of her required classes. *Id.* at 17. Mr. Kipp reported that Mother attended five support coaching classes, ten parenting classes, one housing class, and no financial planning classes. *Id.* at 15; 18. Mr. Kipp also reported that Mother was unenrolled from a program for non-participation three times during the life of the case. *Id.* at 18.

Mr. Kipp testified that Mother's visits with [Child] were to be supervised weekly at the agency for one hour. *Id.* at 18. Mother's visits remained the same throughout the life of the case. *Id.* Mr. Kipp testified that Mother attended approximately three quarters of her visits with [Child]. *Id.* at 19. Mr. Kipp also testified that CUA was concerned about a potential plot by Mother to kidnap [Child] after a visit. *Id.* at 19. Mr. Kipp testified that Mother reached out to several people stating that she wanted to take [Child] from the case aid, Raymond, after a visit. *Id.* at 20.

Regarding Mother's relationship with [Child], Mr. Kipp testified that [Child] did recognize Mother, but there was no discernible mother-child bond between them. ***Id.*** at 21. He added that [Child] never asked to visit nor expressed a desire to see Mother, nor did [Child] get upset when the visits ended. ***Id.*** at 16-18. Mr. Kipp also testified that [Child] is bonded with her kinship parents and everyone in the kinship family. [Child] looks to her kinship parents for her basic needs as well as love, support, care, and comfort. ***Id.*** at 33. Mr. Kipp testified that the kinship parents' home is a pre-adoptive home for [Child]. ***Id.*** at 33. Ms. Kipp advised the court that [Child] has lived with her kinship parents her entire life except when she was in the hospital. ***Id.*** at 16-21. He stated that she was doing very well in the home, and that it was in [Child's] best interest to change her goal to adoption. ***Id.*** at 30. Mr. Kipp stated that if the court were to involuntarily terminate Mother's rights, there would be no irreparable harm to [Child]. ***Id.*** at 22.

Trial Ct. Op., 10/20/21, at 1-6 (some formatting altered).

On May 10, 2021, the trial court issued an opinion and goal change order granting DHS's petition to terminate Mother's parental rights under Section 2511(a)(1), (2), (5), (8), and (b). Mother filed timely notices of appeal and complied with Pa.R.A.P. 1925(a)(2)(i) and (b).[4]

On appeal, Mother presents the following issues for our review:

1. Did the court below err in finding that [DHS] had met its burden in proving grounds under [Section] 2511(a)(1), (2), (5), and (8)?

2. Did the court below err in finding that DHS had met its burden to prove that termination would be in Child's best interests, under [Section] 2511(b)?

_____

[4] On September 27, 2021, this Court issued an order remanding this matter to the trial court for a Rule 1925(a) opinion. The trial court timely complied and issued a Rule 1925(a) opinion stating the reasons for the termination and goal change orders and addressing the issues raised in Mother's Rule 1925(b) statement.

3. Did the court below err when it found that DHS by clear and convincing evidence had met its burden to change Child's goal to adoption?

Mother's Brief at 5 (some formatting altered).[5]

In reviewing an appeal from an order terminating parental rights, we apply the following standard of review:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. [*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by

_____

[5] In her brief, Mother raises an additional issue concerning the trial court's failure to issue a Rule 1925(a) opinion addressing Mother's claims on appeal. However, as noted above, we remanded this matter for the trial court to remedy this deficiency. Because the trial court filed an opinion addressing Mother's claims, we need not address this issue further.

the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" ***Id.*** (citation omitted).

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b) . . . .

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we "may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a)." ***In re M.T.***, 101 A.3d 1163, 1179 (Pa. Super. 2014) (*en banc*) (citation omitted).

## Section 2511(a)(2)

We first address Mother's challenge to the evidence supporting termination under Section 2511(a)(2). Mother's Brief at 19. Mother emphasizes that a trial court "is not barred from considering" a parent's effort to remedy conditions after a termination petition has been filed under Section 2511(a)(2). *Id.* at 19. Mother claims that "[i]n many instances, [she] did **initiate** such efforts" and that "there is no requirement that the efforts be **completed** at some arbitrary date." *Id.* at 19-20 (emphases in original). Specifically, she asserts that she made progress with her objectives by attending drug and alcohol programs, engaging in classes with ARC, and attending visits with Child. *Id.* at 19-20. Therefore, she concludes that there was insufficient evidence to warrant termination under Section 2511(a)(2). *Id.* at 20.

Section 2511(a)(2) provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

To satisfy the requirements of [Section] 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied.

*In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019) (citations and quotation marks omitted).

Further, this Court has explained:

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are "not limited to affirmative misconduct." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002).

Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." [*A.L.D.*, 797 A.2d at 340]. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.*

- 9 -

*In re Z.P.*, 994 A.2d 1108, 1117-18 (Pa. Super. 2010) (some citations omitted and formatting altered).

Here, the trial court addressed Section 2511(a)(2) as follows:

Applying [Section 2511](a)(2) to this case, it is clear that DHS met its burden of demonstrating that termination of Mother's parental rights and changing the Child's goal to adoption was proper. [Child] was initially placed in DHS care because Mother tested positive for Percocet at [Child's] birth, for which she did not have a prescription. Although [Child] did not test positive for any substances, she was experiencing significant withdrawal symptoms and spent several weeks in the NICU on morphine maintenance. Additionally, the evidence established that incapacity under [Section 2511(a)(2)] existed given that Mother failed to demonstrate a concrete desire or ability to remedy the conditions that led to [Child's] placement. Mother failed to participate in a mental health treatment program to address her mental health concerns. Mother also tested positive for PCP, cocaine, and benzodiazepine in February 2021. Moreover, while Mother engaged in various ARC services, she failed to complete classes for parenting, housing, and financial planning.

This court found that Mother's failure to fully or substantially comply with her single case plan objectives throughout the case left [Child] without essential parental care, control, or subsistence necessary for her physical or mental well-being, and the causes of the incapacity will not be remedied by Mother. For these reasons, the court found that clear and convincing evidence existed to justify the involuntary termination of Mother's parental rights pursuant to [Section] 2511(a)(2).

Trial Ct. Op. at 11.

Following our review, we find no abuse of discretion or error of law in the trial court's conclusion that DHS presented clear and convincing evidence to support termination of Mother's parental rights under Section 2511(a)(2). *See S.P.*, 47 A.3d at 826-27; *see also R.N.J.*, 985 A.2d at 276.

The record reflects that after Child was placed in kinship care in June of 2019, Mother's SCP objectives were as follows: (1) maintain appropriate housing and employment, (2) complete three random drug screens, (3) attend parenting, housing, and financial education classes through ARC, (4) participate in a dual diagnosis program to address her mental health and drug and alcohol history, and (5) participate in visitation. *See* N.T. Termination Hr'g at 14. The trial court credited Mr. Kipp's testimony that Mother minimally complied with her permanency objectives and made no progress in achieving them. *See id.* at 23.

As noted by the trial court, Mr. Kipp testified that Mother attended approximately three-quarters of her visits with Child. *Id.* at 19. However, visitation never progressed further than one-hour supervised visits at the agency due to Mother's noncompliance, drug use, unstable housing, and unaddressed mental health concerns. *Id.*

As to Mother's ARC classes, Mr. Kipp reported that Mother attended five support coaching classes, ten parenting classes, one housing class, and no financial planning classes. *Id.* at 15. However, Mother did not complete any of the required classes and was unenrolled for non-participation three separate times. *Id.* at 15.

With respect to Mother's dual diagnosis and drug testing objectives, Mr. Kipp testified that Mother was enrolled in an alcohol treatment program at the time of the termination hearing. *Id.* at 15. He also stated that Mother had previously enrolled in inpatient drug and alcohol treatment at Ambrosia, but

she left against medical advice after completing only half of the program. *Id.* at 16. Further, Mr. Kipp indicated that Mother had failed to participate in any mental health treatment or complete an evaluation through BHS. *Id.* at 16-17. Finally, Mr. Kipp testified that although Mother was referred to CEU for nine random drug screens, she completed only one. That test came back positive for PCP, benzodiazepine, and cocaine in February of 2021. *See id.* at 14.

Under these circumstances, the record supports the trial court's conclusion that Mother's continued incapacity has caused Child to be without essential parental care and that the causes of that incapacity cannot or will not be remedied. *See C.M.K.*, 203 A.3d at 262; *Z.P.*, 994 A.2d at 1117-18. Although we recognize that Mother attempted to complete at least some of her SCP objectives, her efforts were insufficient to preserve her parental rights under Section 2511(a)(2). *See Z.P.*, 994 A.2d at 1117 (stating that a parent's "efforts may be insufficient to remedy parental incapacity under [Section 2511(a)(2)]"); *see also E.A.P.*, 944 A.2d at 82 (explaining that "the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties," particularly when "disruption of the family has already occurred and there is no reasonable prospect for reuniting it" (formatting altered)).

Therefore, we discern no abuse of discretion by the court in determining that Mother's conduct warrants termination under Section 2511(a)(2). *See S.P.*, 47 A.3d at 826-27; *see also R.N.J.*, 985 A.2d at 276. Accordingly,

- 12 -

Mother is not entitled to relief. ***See M.T.***, 101 A.3d at 1179 (stating that we may affirm a termination order based on any subsection of Section 2511(a)).

**Section 2511(b)**

Mother also challenges the trial court's conclusions regarding Child's best interests under Section 2511(b). Mother contends that there was "insufficient evidence as to whether or not there was a bond between [Child] and Mother." Mother's Brief at 24. Further, she claims that "there was scant testimony concerning the likely effect on [Child] of permanently severing any bond that might exist." ***Id.*** Therefore, Mother argues that DHS failed to present clear and convincing evidence that termination was in Child's best interest and the trial court erred in failing to conduct a proper analysis. ***Id.*** at 25-26.

Section 2511(b) states:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(b).

This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but the focus of Section 2511(b) is on the child. ***See In re C.L.G.***, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (some citations omitted).

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008).

Nonetheless, the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, as "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *T.S.M.*, 71 A.3d at 267 (citation omitted). Further, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *Id.* (citation omitted).

- 14 -

As this Court has noted, "a parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (citations omitted).

Nonetheless, "[w]hen examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship,' thereby causing a child to suffer 'extreme emotional consequences.' *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018) (citation omitted).

Here, the trial court addressed Child's best interests as follows:

Based on the evidence, this court determined that [Child] would not suffer any irreparable harm if Mother's parental rights were terminated. After spending several weeks in the NICU on morphine maintenance, [Child] was discharged from the hospital. She was placed in her current kinship home, where she has resided since then. There was compelling testimony presented at the TPR hearing that [Child] is not bonded with Mother and has no parent-child relationship with her. Mother's visits with [Child] were to be supervised weekly at the agency for one hour, and her visits have never progressed further throughout the duration of the case. While Mr. Kipp testified that [Child] recognizes Mother at visits, she has never asked about her nor expressed a desire to see Mother.

By failing to fully comply with her single case plan objectives, Mother has demonstrated that she is not interested in maintaining a parent-child relationship with [Child]. In determining the best interest of the child, this court must consider both the needs and welfare of the child such as love, comfort, security, and stability. [Child] does not look to Mother to meet these needs. [Child's]

- 15 -

kinship family, however, does provide [Child] with love, support, care, comfort, and stability. [Child] looks to her kinship parents to meet her basic needs. Mr. Kipp testified that [Child] is bonded with her kinship family, is very happy in the home, and has lived there her entire life except when she was hospitalized. Additionally, the kinship parents' home is a pre-adoptive home and [Child] lives there with her siblings. Clear and convincing evidence was presented to establish that there would be no irreparable harm caused to [Child] if this court terminated Mother's parental rights. For these reasons, this court properly found that it would be in the best interest of [Child] to grant DHS's petition to terminate the parental rights of Mother pursuant to [Section] 2511(b).

Trial Ct. Op. at 14-15.

Based on our review of the record, we discern no basis to disturb the trial court's finding that termination of Mother's parental rights would best serve Child's needs and welfare. *See T.S.M.*, 71 A.3d at 267.

As noted previously, the trial court credited Mr. Kipp's testimony that there was no discernible bond between Mother and Child. *See* N.T. Termination Hr'g at 19-23 (reflecting Mr. Kipp's testimony that although Child recognized Mother, there was no mother-child bond between them; Child never asked to visit Mother or expressed a desire to see her, and Child did not get upset when the visits ended). The trial court also credited Mr. Kipp's statement that Child shares a bond with her foster parents, who provide a stable and healthy environment for Child, and are the only parents she has ever known. *Id.* at 30-35. Therefore, the record supports the trial court's conclusion that no bond existed between Mother and Child, and that termination would serve Child's best interests. *See K.Z.S.*, 946 A.2d at 762-63; *R.N.J.*, 985 A.2d at 276. Further, this Court has stressed that "a child's

life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities." *Interests of D.R.-W.*, 227 A.3d 905, 914 (Pa. Super. 2020) (citation omitted and formatting altered).

For these reasons, we discern no abuse of discretion by the trial court in applying Section 2511(b). *See S.P.*, 47 A.3d at 826-27. Accordingly, Mother is not entitled to relief.

**Goal Change to Adoption**

Mother also challenges the trial court's decision to change Child's permanency goal from reunification to adoption. Mother's Brief at 26. First, Mother claims that the trial court failed to consider DHS's alleged failure to make reasonable efforts to assist Mother with reunification. *Id.* at 28. Further, Mother argues that the trial court was "unsympathetic as to providing Mother with any more 'ample time and opportunity'" to complete her objectives and denying her request for an in-person hearing, although "[t]he mere passage of time – without reasonable efforts being made to assist Mother – cannot suffice." *Id.* at 28-29. Finally, Mother concludes that "DHS did not prove by 'clear and convincing' evidence that changing the goal to adoption would be in [Child's] best interests, and the trial court erred in not conducting a proper analysis." *Id.* at 30.

Initially, we note that in light of our decision to affirm the trial court's termination decree, Mother's challenge to the goal change order is moot. *See D.R.-W.*, 227 A.3d at 917 (concluding that the parent's goal change claim was moot in light of this Court's decision to affirm the trial court's termination

- 17 -

decrees and noting that "[a]n issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect" (quoting *In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002)). Therefore, Mother is not entitled to relief on this claim.[6,7]

## Due Process

Finally, Mother claims that the trial court violated her due process rights by rejecting her request for an in-person hearing and conducting the termination hearing remotely.[8] Mother's Brief at 15.

By way of background to this issue, the trial court explained:

---

[6] In any event, as noted previously, Child has been in kinship care since her birth in June of 2019. Since that time, Father and Mother have made minimal progress in achieving their service plan goals. Based on testimony presented at the termination hearing, the trial court concluded that Child's placement remained necessary. Further, the trial court found that Child's placement was appropriate and feasible, noting that Child "is well-adjusted and has been thriving in her kinship family's home. [Child] resides there with two other siblings, and has a strong bond with her kinship parents, as well as everyone else in the kinship home." Trial Ct. Op. at 15. Importantly, the trial court credited Mr. Kipp's testimony that adoption was in Child's best interest. *Id.* at 6. Under these circumstances, we would find no abuse of discretion by the trial court in changing Child's permanency goal to adoption. *See R.J.T.*, 9 A.3d at 1190; *D.R.-W.*, 227 A.3d at 917-18.

[7] To the extent Mother raises DHS's alleged failure to make reasonable efforts toward reunification, we note that the Juvenile Act does not require a showing of reasonable efforts in order to terminate parental rights. *See In re D.C.D.*, 105 A.3d 662, 673-74 (Pa. 2014). Therefore, this claim is meritless.

[8] Mother did not include this issue in her statement of questions. *See* Pa.R.A.P. 2116(a) (stating that "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby"). However, because this claim is encompassed in Mother's overall challenge to the termination proceedings, we decline to find waiver.

On March 16, 2020, the Supreme Court of Pennsylvania issued an order declaring a general, statewide judicial emergency due to the global pandemic caused by COVID-19. On March 17, 2020, the Honorable Idee C. Fox, President Judge of the Court of Common Pleas [in] Philadelphia County, ordered that all First Judicial District court proceedings be suspended. To preserve the interest of justice and not to delay dependency proceedings further, on April, 2, 2020 an order was issued that the that the Philadelphia Family Court building would remain closed to the public, but that dependency proceedings may be conducted remotely using Advanced Communication Technology (ACT).[9] Since then, the majority of dependency proceedings in Philadelphia in 2020 and 2021 were conducted remotely using ACT. On June 21, 2021, the Supreme Court of Pennsylvania issued an order stating that the Unified Judicial System would return to pre-pandemic status on July 6, 2021.

On the day of the TPR hearing[, May 10, 2021], Mother's counsel requested an in-person hearing. Mother's counsel argued that because client was not able to have a videoconference on her device, the Court would not be able to assess Mother's demeanor and credibility and Mother would be at a disadvantage. When asked why Mother's counsel waited until the day of the TPR hearing to request an in-person hearing, her response was that she just found out about Mother's technological issue that day. This court found that it was capable of conducting hearings and assessing witness credibility with or without video, and the hearing proceeded remotely.

Trial Ct. Op. at 16.

On appeal, Mother argues that "even in administrative proceedings,

which generally have less constitutional and legal protections for parties, [d]ue

[p]rocess has been frequently protected[, a]nd decisions based upon 'remote'

---

[9] Advanced communication technology includes, but is not limited to: systems providing for two-way simultaneous communication of image and sound; closed-circuit television; telephone and facsimile equipment; and electronic mail. *See* Pa.R.J.A. No. 1952(A)(2)(e) & cmt. (citing Pa.R.Crim.P. 103 for the definition of advanced communication technology).

hearings have frequently been reversed upon appeal." Mother's Brief at 15 (citing *Knisley v. Com., Unemployment Comp. Bd. of Review*, 501 A.2d 1180 (Pa. Cmwlth. 1985) (concluding that courts cannot conduct telephone hearings in unemployment compensation matters without promulgating guidelines to protect due process rights) and *Weston v. Com., Unemployment Comp. Bd. of Review*, 520 A.2d 953 (Pa. Cmwlth. 1987) (same)). Mother argues that, because there were no procedural "safeguards" outlined in the emergency orders issued by our Supreme Court, the trial court violated her due process rights by conducting a remote hearing. Mother's Brief at 17.

"A question regarding whether a due process violation occurred is a question of law for which the standard of review is *de novo* and the scope of review is plenary." *Commonwealth v. Tejada*, 161 A.3d 313, 317 (Pa. Super. 2017) (citation omitted).

> [I]t is well-settled that any individual whose parental rights are to be terminated must be afforded due process – that is, certain procedural safeguards. *See In re A.N.P.*, 155 A.3d 55, 66 (Pa. Super. 2017) (citing *In re Interest of K.B.*, 763 A.2d 436, 439 (Pa. Super. 2000)); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."). "Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." *A.N.P.*, 155 A.3d at 66. (citation omitted).

*In re Adoption of K.M.D.*, 261 A.3d 1055, 1059 (Pa. Super. 2021) (some formatting altered).

This Court has explained that "[d]ue process is flexible and calls for such procedural protections as the situation demands." *See In re Adoption of Dale A., II*, 683 A.2d 297, 300 (Pa. Super. 1996) (citations omitted). Therefore, although parents have a due process right to participate in termination proceedings, that right is "not violated merely because he or she is not able to **attend** the termination hearing. Rather, the more important question is whether the procedure offered or employed adequately served to convey the parent's testimony regarding the proposed termination." *In Interest of A.P.*, 692 A.2d 240, 243-44 (Pa. Super. 1997) (emphasis added) (finding no due process violation where the father participated in the hearing via telephone); *see also Dale A.*, 683 A.2d at 299 (rejecting a due process claim where the father provided testimony through interrogatories brought to court by his attorney)).

Here, the trial court addressed Mother's claim as follows:

Because this court was able to assess Mother's credibility without video access, the TPR hearing proceeded remotely.

This court followed the First Judicial District of Pennsylvania's Court Order by conducting hearings remotely using ACT for COVID-19 prevention. This court ruled based on the evidence presented and did not err in terminating Mother's parental rights during a remote hearing.

\* \* \*

Mother was appointed counsel to represent her at each listing. At each listing, and specifically at the TPR hearing on May 10, 2021,

- 21 -

> Mother was never denied the opportunity to participate, testify, and present evidence and witnesses on her own behalf. Mother, through her attorney, participated at this hearing, testifying and cross-examining witnesses. Because due process only requires notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal, Mother's due process rights were not violated.

Trial Ct. Op. at 16-17.

Based on our review of the record, we agree with the trial court's conclusion. As noted previously, all parties participated in the termination hearing remotely in light of the ongoing COVID-19 pandemic. Although Mother did not have video capabilities on her cell phone, she was able to meaningfully participate in the hearing by providing her testimony over the phone. Further, Mother was also represented by counsel, who cross-examined DHS's witnesses and argued on Mother's behalf. Under these circumstances, we find no basis to conclude that the trial court violated Mother's due process rights by taking her testimony over the phone or by conducting the hearing remotely. **See A.P.**, 692 A.2d at 243-44; **see also Dale A.**, 683 A.2d at 299-301. Accordingly, Mother is not entitled to relief.

Orders affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/1/2022

- 22 -